200 So. 894

**MURPHY v. MERCHANTS NAT. BANK OF MOBILE et al.**

1 Div. 125.

Supreme Court of Alabama.

Feb. 20, 1941.

Rehearing Denied March 20, 1941.

Harry T. Smith & Caffey, of Mobile, for appellant.

McCorvey, McLeod, Turner & Rogers, of Mobile, for appellee.

Pillans, Cowley & Gresham, of Mobile, for garnishees.

THOMAS, Justice.

The appeal presents questions touching the several garnishees, complainant and as respondent to the cross-bill, the Merchants National Bank of Mobile, as respondent and cross-complainant against Murphy and the garnishees.

The named garnishees were necessary parties in order that a final judgment might be rendered against all parties in interest, according to their respective liabilities and as insurers of the property in question. The garnishees were brought in with Murphy as necessary parties by the answer and cross-bill of the Merchants National Bank of Mobile, appellee.

The final judgments being in favor of Murphy in the Fidelity-Phenix suit, judgments in favor of Murphy were entered in the other six suits in the respective amounts for which the garnishees subscribed in the policy of insurance, plus interest under Sections 8563–8564.

In each of the seven suits, interest was calculated at the statutory rate, the policy itself not containing an undertaking on the part of the underwriters to pay interest. Fidelity-Phenix Fire Ins. Co. of New York v. Murphy, 231 Ala. 680, 166 So. 604; Id., 299 U.S. 557, 57 S.Ct. 19, 81 L.Ed. 410.

The litigation between Murphy and Fidelity-Phenix ended on October 12, 1936, whereon the Supreme Court of the United States denied the Company's application for a writ of certiorari. Thereupon, in accordance with the stipulation, judgments were entered on October 28, 1936, in the six other cases, as appears from the statements set out in the record.

It is the insistence of the garnishees that when these judgments were entered, the garnishees were faced (1) with a claim of Murphy's counsel, for their attorneys' fees; (2) a writ of garnishment issued out of the United States District Court on a judgment therein rendered against Murphy; (3) the writ of garnishment issued by the Merchants National Bank in the main cause now pending before this court; and (4) the payment of the judgments themselves. The garnishees, on the next day after rendition of these judgments, i. e., October 29, 1936, placed a sum of money with their counsel, sufficient to pay in full all the judgments against them. On November 3d motions for payment of the attorneys' fees of Murphy's counsel were granted by the circuit court, and upon the same day counsel for the garnishee paid those attorneys' fees, which totaled $8,217.91.

The item chargeable to the Fidelity-Phenix Fire Ins. Co. of New York of $371.-90, being the penalty assessed by this Court upon the affirmance of the judgment in favor of Murphy (Fidelity-Phenix Fire Ins. Co. of New York v. Murphy, 231 Ala. 680, 166 So. 604), does not carry interest. This is the effect of our recent decisions in Montgomery Light & Water Power Co. v. Thombs, 204 Ala. 678, 87 So. 205; Jefferson County v. City of Birmingham, 235 Ala. 199, 203, 178 So. 226; Jean v. Sandiford, 39 Ala. 317.

The respective sums disclosed by the several answers that were uncontested must be taken as true. It remains only to declare the liability vel non of said garnishee's interest under the statutes which obtain.

In respect to liability generally of a garnishee for interest pendente lite, the majority rule is thus stated by the courts, aside from statutes, in 28 Corpus Juris, p. 247, § 342, as follows: "The prevailing rule is that a garnishee is not chargeable with interest in favor of plaintiff during pendency of the proceedings, unless he has contracted to pay interest, or actually receives interest, or continues, after service of the writ, to use the money due, or wrongfully detains it, or there has been collusion or unreasonable delay on his part. In some jurisdictions, however, where a garnishee may have leave at any time to bring the debt into court, he is chargeable with interest from the time it becomes due until it is paid if he does not so relieve himself from further responsibility. * * *."

We are thus brought to a consideration of our statute, Michie's Code § 8068, which reads as follows: "When the garnishee admits indebtedness or liability to the defendant, and the defendant has not executed bond for the dissolution of the garnishment as provided in this chapter, the garnishee may, by order of the court first had and obtained, pay the amount of such indebtedness or liability, or so much thereof as the court may direct, into the hands of the clerk, to be held subject to the judgment in the cause; and such payment has the effect to discharge the garnishee from liability for the amount so paid and interest subsequently accruing thereon, but does not prevent

the interposition and trial of collateral issues, as provided in this article."

The note to said section reads as follows: "After service of the garnishment, the garnishee stands in the relation of a stakeholder, and is supposed to be indifferent as between the plaintiff and the defendant. From all personal liability, and from all peril of future controversy, he may protect himself by payment into court of the debt he may owe, or by the delivery of such property in his hands, as may be subject to the garnishment. Drake on Attach. section 661; Montgomery Gas Light Co. v. Merrick & Sons, 61 Ala. 534, 536."

Counsel for garnishee admit that the question of liability of garnishee for interest "pendente lite, in the circumstances, is without precedent" in this jurisdiction. The nature of garnishees' liability to Murphy was liability under policies of insurance on which suit was brought and judgment rendered in this court. Harry J. Frahn Co. Inc., v. National Realty Management Co., Inc., 236 Ala. 681, 185 So. 162. The garnishees did not contract to pay interest; and that liability attached to the judgment under Code §§ 8563–8565. The latter section is as follows: "Judgments and decrees for the payment of money other than costs, bear interest from the day of rendition."

In Sovereign Camp, W. O. W. v. Reed, 208 Ala. 457, 94 So. 910, this court held that in a suit on a mutual benefit certificate, plaintiff should on the trial (1) be given interest from the date defendant filed initial pleading resisting payment to the date of the final judgment; (2) after judgment, or under the statutes that obtain, the amount of the judgment is determined from the value of the certificate of insurance with interest to date of rendition of judgment of affirmance in this court. Kinney v. Pollak, 223 Ala. 654, 137 So. 669; City of Birmingham v. Simmons, 222 Ala. 111, 130 So. 896, 74 A.L.R. 766.

It was agreed that the final judgment of liability in the suit against the Fidelity-Phenix would govern the liability of the other six suits. In other words, each case was governed as to the amount of the liability by its policy of insurance, credits and interest at the rate that obtained.

What of the "circumstances" that it is alleged took the garnishees without our statute, Section 8068 of the Code, and placed them within the majority rule as to interest touching a garnishee that is a mere stakeholder? The general rules of payments and credits relieving of liability by garnishee are thus stated in 28 Corpus Juris, p. 403, § 632: "Payment or other satisfaction by the garnishee of a final judgment rendered against him by a court having jurisdiction discharges the garnishee from further liability to plaintiff. Also such payment, to the amount thereof, extinguishes the indebtedness of the garnishee to defendant [White v. Simpson, 107 Ala. 386, 18 So. 151] and constitutes protection to the garnishee against a suit by defendant or his privies on the same cause of action. * * * In order that the garnishee, in an action against him by defendant or his assignee, may take advantage of payment of the judgment in the garnishment proceedings he must show that the court in such proceedings obtained jurisdiction, that judgment was rendered against defendant, that the debt for which the garnishee was charged and which he paid is identical with the debt in controversy, and that he was compelled to pay under due process of law. In other words in order to afford the garnishee protection from a second payment of the same debt or liability, payment under the garnishment proceedings must not have been voluntary. * * *."

See Bessemer Sav. Bank v. Anderson, 134 Ala. 343, 32 So. 716, 92 Am.St.Rep. 38; Mason v. Crabtree, 71 Ala. 479.

To answer the question of liability vel non of these garnishees, it should be here stated that we have found in the record no circumstances set up which would relieve them of interest.

Instead of availing themselves of the provisions of Section 8068 of the Code, whereby garnishees would have been relieved of interest on the amount of the debt admitted to be due by each of them to defendant Murphy, they placed the sum in trust with their attorneys. This action on the part of garnishees did not relieve them of interest. It results, therefore, that said garnishees are liable to defendant for the amounts of judgments against them at the prevailing rate of interest, less any credits to be allowed them, from date of respective judgments against them in the Circuit Court of Mobile County up to and including the date of judgment in this court. We have indicated that the Fidelity-Phenix Fire Insurance Company of New York is liable for their penalty of $371.90, without interest, and other sums due by it will be calculated at the prevailing rate of inter-

est from date of judgment, less credits, to the date of judgment in this court. A final judgment of condemnation may be had in the circuit court against each garnishee for such sums due, both Murphy and the bank being interested in the amounts of the judgments against the several garnishees.

The rights and liabilities of the bank and the respective garnishees being decided in the foregoing, we are brought to a consideration of the main case of Murphy v. The Merchants National Bank of Mobile.

As we have indicated, the bank filed a suit on the law side of the circuit court docket, claiming the sums indicated, interest thereon and attorneys' fees [as to the amount due by Murphy to the bank as endorser of a waiver of exemption note given the bank by Baker Gravel and Material Company, Inc., a corporation], and for the sums due by Murphy on his individual notes and mortgages, in the evidences of indebtedness there being provisions for the payment of reasonable attorneys' fees.

The suit of the bank against Murphy on the law side of the docket setting up equitable questions of defense, the cause was duly transferred to the equity docket of said court. The pleadings were recast, Murphy becoming complainant and the bank and garnishees being made respective respondents. Murphy's bill as amended alleged that while he was endorser to the extent of $31,675 of the note of Baker, Gravel and Material Company, Inc., that the note had been fully paid, in that Murphy was heavily damaged by the alleged wrongful suing out of garnishment to the insurance company, and that the bank is largely indebted to Murphy as a result of the S. S. Annie Murphy on which the bank held a second mortgage, and on which there was a first mortgage given by Murphy to the United States of America acting through the Shipping Board, which first mortgage was subsequently assigned to the bank.

The bill further alleges that under an agreement between Murphy and the bank, said bank was permitted to sell the ship at private sale for the best price obtainable using a "blank bill of sale", which Murphy gave to the bank just before he went away from the state under sentence from the Federal Court; that the bank sold the ship for $31,000 to the Mobile, Miami and Gulf Steamship Company and reported to Murphy that the sale was for $17,500. It is further alleged that the bank did not use due diligence for the purpose of obtaining a reasonable price, but sold said property for greatly less than its true value, in consideration of that company paying to the bank a sum of money for "the bank's own benefit."

It is further alleged that the bank and the purchasing steamship company and the ultimate purchaser, the Waterman Steamship Corporation, were allied in business, and that the vice president of the Merchants National Bank who conducted the transaction of sale was a stockholder in the steamship corporation, which it is alleged controlled the Mobile, Miami and Gulf Steamship Company.

It is further alleged in the amended bill that Murphy, previous to the transaction complained of, in 1926, purchased the steamship from the United States Shipping Board for $31,000, payable $7,750 cash, with the balance payable over a period of years bearing interest, and that Murphy had agreed to put certain improvements on the vessel, which he did, during the interval of his use and before the time that he requested the bank to sell the ship.

It is further alleged that the Mobile, Miami and Gulf Steamship Company subsequently sold the vessel to the Waterman Steamship Corporation "for $70,000". It is further averred that on the purchase of the vessel for $31,000 by Murphy, he was required by said Shipping Board to carry $75,000 insurance on the same, subsequently reduced to $60,000; that the bank renewed the insurance for the amount that Murphy had carried on said property.

It is charged in the amended bill that the bank was liable for the reasonable value of the vessel, regardless of the foreclosure sales made by the bank, and to which reference will be made later in this opinion.

The bank's pleadings show that after parol agreement of sale was made by the bank to the Mobile, Miami and Gulf Steamship Company, "that the bank was advised by its counsel that the bill of sale given by Murphy to the bank could not be used for the reason that in the meantime the United States Government had recovered a judgment against Murphy in a large sum by way of penalties and costs," and that a title could not be made under the bill of sale which would relieve against the government's certificate of judgment, and hence the bank foreclosed by a libel in

the United States Court the first mortgage on the S. S. Annie Murphy, which mortgage the bank had purchased from the United States; that at the public auction sale held by the United States Marshal, pursuant to such proceedings in libel, the vessel was purchased by the bank for the sum of $9,969.98; that the bank notified Murphy by letter that it had been advised by attorneys in view of outstanding judgment recorded, under Alabama statutes, there was a lien on the vessel in behalf of the United States; that the bill of sale given by Murphy to the bank for use in making a private sale could not be used.

We observe here that Murphy is to be charged with the amount of the bid in the United States Court sale, the reasonable costs expended, and reasonable attorneys' fees incurred by the bank in the foreclosure for libel suit.

It is alleged in the amended bill by Murphy that the bank represented to him that it had sold the steamship for $17,500, when in truth the bank had sold the same for $31,000; that the bank did not perform the trust imposed upon it by Murphy when he left with it the blank bill of sale for use in selling the ship at private sale.

The effect of the amended bill was that the bank should have received a larger sum for the said vessel and that an accounting should be ordered by the court to ascertain the true amount due by the bank to Murphy or by Murphy to the bank on the respective obligations, hereinafter to be referred to in some detail.

It should have been stated that the bank filed its answer to Murphy's bill of complaint, made it a cross-bill, naming Murphy, the complainant in the original bill, and the several insurance corporations liable on respective insurance policies, as cross-respondents. That answer and cross-bill allege in substance the garnishments in questions were in fact issued in an effort by the bank to collect the indebtedness owing to it by Murphy; that such garnishment proceedings were in all respects regular; that at the time the garnishments were issued, Murphy was making no effort to pay his indebtedness to the bank and that the bank knew of no other manner in which to collect the just obligations owing to it by Murphy under the several notes and mortgages to be indicated.

The mortgages indicated in the answer and cross-bill of the bank were a first mortgage given on November 24, 1926, by Murphy to the United States Shipping Board for the purchase of S. S. Annie Murphy for $31,000 on which had been made a cash payment of $7,750, for which balance Murphy gave his first mortgage payable over a period of five years in equal installments bearing five per cent interest. That mortgage described the vessel as the S. S. "Lake Falama", the same vessel as S. S. Annie Murphy and being the vessel here involved. That is to say, after his purchase of the vessel, Murphy changed the name thereof from "Lake Falama" to "Annie Murphy." This mortgage, the government authorities duly assigned to the bank on January 10, 1931, and the balance due thereon of $9,300.

On August 15, 1929, the Baker, Gravel and Material Company was indebted to the bank in the sum of $31,675, and gave its. mortgage to the bank, secured by the barges and dredges described thereon; that John G. Murphy was endorser on his company's notes for the sum of $31,675.

On April 29, 1930, it is alleged that it became apparent to the bank that the barges and dredges to secure the sum indicated in the mortgage, endorsed by Murphy, were not of sufficient value to protect that mortgagee, and to secure an extension of its due date, Murphy gave the bank another mortgage as additional security for that indebtedness. This second mortgage being of date of April 29, 1930, covered a large crane and clam shell bucket.

On December 26, 1930, Murphy had not paid his indebtedness to the bank and the bank obtained from him a second mortgage on the steamship Annie Murphy, which was given to secure Murphy's note for $250, to secure the balance of $16,005 due on the Baker Gravel and Material Company, Inc., note for $31,675, which was, as we have indicated, endorsed by Murphy. This mortgage was also security for a note of Murphy for $5,000, payable to the order of the Mobile Ship Chandlery Company, which claim of $5,000; the record shows, has since been adjusted and is laid out of the case.

The mortgage of December 26, 1930, contained provisions that on foreclosure the proceeds of sale should be applied to attorneys' fees, amounts owing to mortgagees for insurance, debts which are secured by prior lien on the vessel, the debt evidenced by the $250 note by Murphy to the balance of $16,005 due on the debt evi-

denced by the note to Baker, Gravel and Material Company, and the debt evidenced by the $5,000 note of Murphy to the Mobile Ship Chandlery Company (laid out of the case by the record as above indicated), and any other debt owing by the defendant to the mortgagees, and provided that if there was any balance that the proceeds should be paid to John G. Murphy.

The answer and cross-bill of the bank denied any failure on its part to discharge of its just duty to Murphy in the sale of the ship; that it was to the interest of the bank to obtain the best price possible on the sale of the vessel, that the "instrument of trust" was merely a receipt which the executive officer of the bank gave to Murphy when the latter gave the bank the blank bill of sale to be used in making a private sale of the vessel. It was in words and figures as follows:

"October 30, 1931.

"Received from John G. Murphy bill of sale covering the S. S. Annie Murphy, official No. 218694, duly executed and complete except for designation of transferee. It is understood that this bill of sale is to be used in transferring title to the S. S. Annie Murphy in event of sale, and that the proceeds of the sale are to be credited on the indebtedness of John G. Murphy to this Bank.

"Merchants National Bank of Mobile, "By J. F. McRae, Vice-President."

It is the contention of appellee that the bill of sale in question was merely one of the methods which the bank could use to make a sale of the vessel; that when it was found that the United States Government had the $5,000 judgment with interest and costs against Murphy, and that the same had been recorded under Alabama statutes, it was impossible to use Murphy's bill of sale to the bank in that whoever accepted the bill of sale signed by Murphy, delivered as it was after the recordation of the certificate of judgment, would take a conveyance of the vessel subsequent to the judgment and as to such a purchaser, the judgment would constitute a prior lien on the property.

Under the law that obtains, the bank's foreclosure of the first mortgage, given on the vessel in 1926, before the judgment against Murphy was obtained in the United States Court, such purchase at foreclosure sale, pursuant to the decree in admiralty courts, would give a title to the steamship superior to any lien that the United States

Government had obtained by the recording of its $5,000 certificate of judgment. That is to say, the bank having the first and the second mortgages to the steamship was required by the purchaser to give a superior title thereto in its sale made for the purpose of liquidating Murphy's liabilities above stated, evidenced by the several mortgages which were in default.

Pleading and evidence refer to the letters written by the vice president of the bank under date of March 10, 1932, and they are as follows:

"Mobile, Alabama
"March 10th, 1932
"JFM/t

"Capt. John G. Murphy
"United States Penitentiary,
"Atlanta, Georgia.
"Dear Capt. Murphy:

"Today I have written you a formal letter by registered mail, which our attorneys inform us is desirable in connection with foreclosure proceedings we are about to institute on the 'Annie Murphy'. We were advised that it would not be safe to use the bill of sale you gave us, in view of the outstanding judgment against you in connection with court costs.

"Mr. Jones has tried hard to do something with the boat, but without success. Charges were mounting up so rapidly, and the boat was deteriorating so fast, that it was absolutely necessary for us to dispose of it. We have made arrangements for a sale to the Mobile, Miami & Gulf Steamship Company. The price has not been definitely agreed upon, but I think it will be $17,500.

"Expressing the hope that you are well, and with best regards, I am,

"Very truly yours,
"(signed) J. F. McRae
"J. F. McRae Vice President."

"Mobile, Alabama
"March 10th, 1932
"Capt. John G. Murphy,
"United States Penitentiary,
"Atlanta, Georgia.
"Dear Sir:—
"Registered
"Return Receipt Requested

"This is to advise you that your notes numbered 4 and 5 in the series of five notes executed on the 24th day of November, 1926, bearing interest at the rate of five per cent per annum, are long past due. These notes, you will recall, were given

to the United States of America in connection with a preferred mortgage made the United States of America on the Steamship 'Lake Falama', now the 'Annie Murphy'. This mortgage was transferred by the United States of America, represented by the United States Shipping Board, to The Merchants National Bank of Mobile and this Bank is the owner of the notes.

"Note No. 4 for $4,650.00 became due and payable on the 24th day of November, 1930, and note No. 5 became due and payable on the 24th day of November, 1931. An examination of the notes shows that the interest was paid until December 26th, 1930, on each of them. The notes bear interest at the rate of five per cent per annum and the interest presently accrued at that rate is $1,028.17. In accordance with the provisions of the notes, we hereby declare them due and payable, together with all interest to date.

"We now demand payment of the principal indebtedness and interest in full. We are forwarding this letter to you by registered post with request for a return receipt, in order that we may know it comes to your hands. It is our purpose to file immediately in the United States District Court for the Southern District of Alabama our libel to foreclose the preferred mortgage on the Steamship 'Annie Murphy'. We shall appreciate it if you will let us hear from you by return post, advising us whether it will be possible for you to meet the demand now made on you for payment of these notes—both principal and interest.

"Very truly yours,
"(Signed) J. F. McRae
"J. F. McRae Vice-President."

Mr. Murphy, testifying in his own behalf, admitted receiving these letters and that he did not answer the same. Nor did he make any objection to the price the bank so advised him at which they had made arrangements to sell the "Annie Murphy." He further admits that from the time he went to Atlanta to serve his sentence, he did not make payments to the Merchants National Bank on its mortgages, and that neither he nor any one else kept the interest on the indebtedness paid or met the incidental expenses that necessarily accrued from time to time in keeping the property in question. The evidence further shows that when the "trade was closed" all papers, including insurance policies, old mortgages, bill of sale, the specifications of the vessel, etc., were turned over in an envelop to the purchaser, the Mobile, Miami & Gulf Steamship Co., and that Murphy's bill of sale to the bank was among these papers.

The evidence further shows that the sale was made and confirmed by the court on May 11, 1932, for the sum of $9,905.79, a copy of the motion for sale of said Annie Murphy pendente lite being attached as an exhibit to the bank's answer and cross-bill. The Register's Report, "Account No. 1", record p. 423, is to the following effect: "* * * 2. Interest at 5% as provided in preferred mortgage Dec. 23, 1930, to date of sale of vessel by U. S. Marshal April 29, 1932—1 year 125 days * * * aggregating $9,969.98."

It is urged by the bank that the auction sale by the U. S. Marshal gave no redemption under Alabama law for a mortgage foreclosure sale of personal property.

It is further insisted that the bank had the right to retain what it received on the resale, but that "to carry out the spirit of its understanding with Capt. Murphy," charged Murphy's account with the $9,-905.79, and credited the indebtedness of John G. Murphy to the bank with everything that the bank was able to realize on a resale of the vessel after deducting the expense thereof.

It is further insisted that the foreclosure proceedings perfected title in the bank, and its sale to the Mobile, Miami & Gulf Steamship Company was delayed for several months for the company to make necessary repairs on the vessel so that it might be seaworthy.

A pertinent part of the evidence indicates the nature of the consideration by which the transfer of the ship was accomplished. This is Mr. McRae's letter dated August 5, 1932, which is as follows:

"August 5, 1932.
"JFM/t

"Mobile, Miami & Gulf Steamship Company, Inc.,

"Mobile, Alabama.

"Gentlemen:

"This will refer to the transaction between us relating to your purchase from this bank of the S. S. 'Fairisle'. You have paid us the sum of $17,500 for our title to the vessel in question. We have loaned you $31,000, secured by a preferred mortgage on the steamer.

"The loan made to you, referred to in the foregoing paragraph, is represented by two notes, both dated August 2nd, one for $13,500, due one year after its date, with interest at 6% per annum from date, and the other for $17,500, payable on demand 'Without interest until demand is made for payment and payment is refused.' We have had an understanding with Mr. Roberts, one of your officers, and this letter evidences that understanding, that you will pay the demand note of $17,500 at the rate of $500.00 per month, and we agree that such plan of liquidation is satisfactory to us. It is not our purpose to make demand on the note in accordance with its terms as long as payments are made in accordance with the understanding here outlined.

"In consideration of the sale of the S. S. 'Fairisle' to you on a gradual liquidation basis, without interest as provided above, it is understood between us that we are to share in the net profits from operation of the 'Fairisle' to the extent of 50% until we have been paid from such source the sum of $7,500. Our understanding through Mr. Roberts is that separate records will be kept, and that a final calculation will be made at the close of each six months period to determine any profit from operation of the 'Fairisle'. If any period reflects a loss, that loss is to be offset by earnings of future operations before division of profits is again made with us. After we have received the full amount of $7,500 from profits, we will have no interest in further operating results, either as to profits or losses. To summarize, when the net profits from operations of the S. S. 'Fairisle', calculated from date of its purchase from us, amount to $15,000, we should then have received $7,500, and final receipt of this last amount, in addition to payment of notes given us, will discharge in full your obligation in connection with the purchase.

"It will be appreciated if you will acknowledge this letter, indicating that your understanding coincides with ours.

"Very truly yours,

"J. F. McRae, Vice-President."

So the whole consideration makes it clear that the trustee was to receive in addition to the $17,500 the further sum of $7,500 in the nature of an interest in the purchaser's business. This the bank may not do and it is insisted that it did not intend to take for itself this additional sum, which was later compromised by the bank with the Mobile, Miami & Gulf Steamship Company, Inc., and the payment of $5,000 in lieu of such provision, which was credited to the profit and loss account of the bank to which Murphy's indebtedness had been transferred.

It is well to indicate that the ship "Fairisle", referred to in Mr. McRae's letter of August 5, 1932, hereinbefore set out in detail is the same ship as "Lake Falama" and "Annie Murphy," the name having been changed the times indicated.

■■ The question presented is the exact date when the sale was accomplished and from what date interest would be calculated on the purchase price as affecting Murphy's indebtedness to the bank. Every sale of personal property requires a delivery, actual or constructive, and under the circumstances of the case and the character of the property dealt with herein, we hold that the date of delivery of the vessel to the purchaser was not as of March 10, 1932, when the vessel was required to be retained for the improvements and repairs to make it seaworthy, but was as of August 5, 1932, when it was capable of being used in the shipping business.

■ The evidence was taken by order of the court and was given ore tenus. The recognized intendments prevail as to the findings of the register and of the court by its decree. The appeals are from such findings of the register and the decree of the court. The decrees of February 14, 1940, in passing on the register's report, were such final decrees as support an appeal. O'Rear v. O'Rear, 227 Ala. 403, 150 So. 502.

■ It was proper to submit both appeals upon the record, as has been done by argument of counsel. Dawson v. City of Birmingham, 216 Ala. 641, 114 So. 221.

It may be said that the writings from Murphy to the bank, the several mortgages above set out and the properties secured thereby created a duty, the liability and trust as of a mortgagee selling and disposing of personal properties covered by mortgage. The rule that obtains as to such liability has had recent expression in Kelly v. Carmichael, 217 Ala. 534, 117 So. 67; Applebaum v. First Nat'l Bank, 235 Ala. 380, 179 So. 373.

In First Nat. Bank of Montgomery et al. v. Sheehan, 220 Ala. 524, 126 So. 409, 413, the general rule of the administration of a testamentary trust is thus stated:

" 'A trustee for sale will remember that he is bound by his office to sell the estate under every possible advantage to his cestuis que trust, and in the case of several successive cestuis que trust, with a fair and impartial attention to the interests of all the parties concerned.' Lewin on Trusts, vol. 1 (8th Ed.) p. 578.

"And it is stated by Mr. Perry that:

" 'Trustees are bound by their office to sell the estate under every possible advantage for the beneficiaries, and if there are different cestuis que trust, they must act with a fair and impartial attention to the interest of all; * * * or if they contrive to advance the interest of one party at the expense of another,—they will be personally responsible to the injured party for the loss.' 2 Perry on Trusts (7th Ed.) § 770, pp. 1320, 1321."

We have examined the voluminous record, and can find no breach of the trust by the mortgagee in foreclosing under the first mortgage in question rather than in making a private sale under the writing of date of October 30, 1931, set out above. Its sale in the United States Court and purchase by the bank, and its resale to the Mobile, Miami & Gulf Steamship Company, Inc., was not a conversion of the mortgaged property as insisted by the appellant.

There was no breach of the trust in the change of the name of the steamship at the bank's instance. Murphy had changed its name after his purchase from the Shipping Board.

It is the judgment of this court, however, that the expenses and attorneys' fees incurred in the effectuating of the change of the name should be borne by the party seeking that change and not by the mortgagor Murphy.

It is further established that a trustee has no authority to sell trust property, or a part thereof, for a contingent interest in the operations of the purchaser's business, or that in which the property so sold is employed. Randolph v. East Birmingham Land Co., 104 Ala. 355, 16 So. 126, 53 Am.St.Rep. 64. When the trustee sold the property for an additional sum of $7,500, the mortgagor Murphy was entitled to a credit for the two sums indicated in the evidence of sale, respectively as $17,500 and $7,500, aggregating $25,000, as of the date of the sale and actual delivery of the ship. This is shown by the letter of August 5, 1932, of Mr. McRae, speaking for the bank, in which he reminds the purchaser that the conditional obligation of $7,500 was to be paid out of earnings of the ship in consideration of the sale of the S. S. "Fairisle" on a gradual basis of liquidation without interest. Mr. Roberts' reply of September 16, 1932, acknowledged that this was his understanding of the agreement. The record further shows a written statement by the purchaser's auditor that the purchase price was $17,500, but that they were required to pay in addition the further sum of $5,000. The evidence is further to the effect that the conditional obligation of $7,500 entailed additional or complicated bookkeeping on the part of the steamship company and they compromised the same with the bank for the sum of $5,000, which was paid. We have indicated that this reduction of the purchase price of the vessel on the part of the mortgagees was without the knowledge, consent or approval of the mortgagor, and hence the reduction will not be allowed by this court in accordance with our decisions.

The fact that the ship had to be conditioned by the required improvements of the purchaser and the rules of navigation necessarily postponed the time of actual delivery to purchaser to August 5, 1932. The above-mentioned parol contract of sale of March 4, 1932, was not the act of consummation of delivery of the vessel so sold. Hence Murphy was not entitled to credit on his debts and assumed obligations as for rentals before August 5, 1932. This is the reasonable construction under the respective duties of the parties and was in consonance with good faith of the parties so circumstanced in dealing with the peculiar properties.

In Marsh et al. v. Elba Bank & Trust Co., 207 Ala. 553, 93 So. 604, 606, it is declared:

"This court in Zadek v. Burnett, 176 Ala. [80] 88, 57 So. [447] 450, wrote: .

" ' "Although the mortgagee, by the terms of the mortgage, was authorized to sell the personal property embraced in the mortgage at private sale, this did not relieve him, in taking possession of and selling the property, from the duty of acting in the utmost good faith in selling the same. In selling the property at private sale for the satisfaction of his mortgage debt, it was his duty to sell it at a fair and reasonable valuation, and, failing to do so he became liable to the mortgager for such failure."

Per Dowdell, J., in Johnson [Bros.] v. Selden, 140 Ala. 418, 37 So. 249, 103 Am.St.Rep. 49. The effect of the authorities is to hold a mortgagee who sells at private sale responsible and accountable for at least the fair and reasonable value of the property, regardless of the price actually received by him.'

"This is clear and comprehensive. Under the alleged facts, if true, the court in this cause can ascertain a fair and reasonable valuation of the personal property, and on the accounting and redemption charge the mortgagee, who sold it at private sale under the power of sale in the mortgage, with the reasonable value of the personal property sold, regardless of the price actually received by the bank for it. * * *"

The same rule was announced in Harmon v. Dothan Bank, 186 Ala. 360, 64 So. 621.

We have carefully considered the evidence and find no error was committed by the trial court in holding that the private sale of the ship to the Mobile, Miami and Gulf Steamship Company, Inc., was for its fair and reasonable value during the period of March to August, 1932. That decree was in error in not fixing that purchase price at $25,000, and for this sum Murphy should have been given credit as of date of August 5, 1932.

We find no error in the entry of credits of sale price to mortgagor Murphy and to his obligations held by the bank, less the necessary expenses and reasonable attorneys' fees incurred in the foreclosure and clearing the property of liens in the United States Court and tax liens by the state and municipality.

The trust property being sold on credit was at the risk and liability of the mortgagee, and, therefore, after the sale the interest should not be borne by the mortgagor Murphy. Hence the charges of interest to Murphy, after such sale, should be eliminated from the amounts claimed by the bank against Murphy on the deferred payments on the price at which the ship was sold. The said interest charges aggregating $2,039.14, and interest charged thereon of $546.34 should be eliminated from the amounts claimed by the bank as due by Murphy.

We have examined the record and find no reversible error in the order of the court as to the bank's action in dealing with or selling any of the properties of the Baker Gravel and Material Company, Inc.,

covered by mortgage; or in the removal of the barges by the bank from Louisiana to the Industrial Canal at Mobile, or in the allowance of the expense of raising the submerged barge pursuant to notice given, in order to clear the Industrial Canal of the obstruction; nor was there error in disposing of the barges in question.

We find no error in the allowance of credits for the purchase price of property embraced in the Baker Company mortgage for $2,201.95; or in allowance of payment of premiums on insurance, and credits for unearned premiums; or for a watchman's salary touching the mortgaged property to the date of delivery.

The attorneys' fees incurred in clearing the property of tax liens were shown to be necessary, reasonable and duly chargeable to the mortgagor Murphy. The attorneys' fees and court costs on foreclosure by libel are deducted from the bid in the United States Court and credit given Murphy for the balance.

There was no error in allowing mortgagee reasonable attorneys' fees for this suit.

The premiums on insurance, the cancellation thereof and rebate on such premiums will be credited as of the date of the delivery of the vessel on August 5, 1932, to the Mobile, Miami and Gulf Steamship Company, Inc., or as of the date of respective rebates so returned.

In passing upon the exceptions to the register's report, relating to the credits for the sale of the ship to be given the mortgagor Murphy, it should be said further, such ruling was in error, as we have indicated, and the mortgagees should have credited Murphy's indebtedness as a result of the sale with $25,000 as of the date of actual delivery of the vessel to purchaser, which was August 5, 1932.

As we have indicated above, the register's report and the judgment of the circuit court, as to such items therein contained and controverted should be calculated in accordance with this decision, as to all parties at interest, including the garnishees.

During the oral argument reference was made to Section 7225 of the Code, providing that "If it be made to appear that usurious interest has been intentionally taken or reserved, the defendant recovers full costs." This provision of the statute has been held not to take from the

court the power to make a just apportionment of costs. Baker v. Orr, 169 Ala. 665, 53 So. 1006; Ward v. Bank of Abbeville, 130 Ala. 597, 30 So. 341; State v. Inman, 239 Ala. 348, 195 So. 448; Preuit v. Wallace, 238 Ala. 162, 189 So. 887.

■ It has been recognized that costs necessarily incurred by the trustor or cestui que trust to compel a defaulting trustee to make a final settlement of his administration of the trust should be assessed against the trustee who has wrongfully necessitated these expenditures on accounting. This result finds expression in 4 Bogert on Trusts, § 962; Pomeroy v. Noud, 145 Mich. 37, 108 N.W. 498; 24 C.J. p. 1057, § 2531; Perry on Trusts, 7th Ed., Vol. 1, § 903; April v. April, 245 App.Div. 841, 281 N.Y.S. 538, 540; In re Rosenfeldt's Will, 185 Minn. 425, 241 N.W. 573; Buder v. Franz, 8 Cir., 27 F.2d 101; Royal v. Royal, 30 Or. 448, 47 P. 828, 48 P. 695.

The foregoing statute was only declaratory of the common law as expounded by the authorities indicated.

■ It is shown by the recast pleadings that the defendant is a national bank, deriving its existence, privileges and powers to act as trustee from the Government of the United States under Sections 85 and 86 of Title 12, U.S.C.A. The observation from the bench as to the contract to pay usurious interest had reference to Section 8567 of the Code. The difference between Section 8567 and the provisions of the Federal Statute which controls an administration of trusts by national banks is that the ordinary trustee which obtains its powers to act as such from the laws of Alabama is governed as to usury by Section 8567, Code of 1923, while the powers and duties of a national bank are controlled and restricted by Sections 85 and 86 of Title 12, U.S.C.A., which limits the power of taking, reserving or charging the rate of interest allowed by the state. It is expressly declared that a national bank doing business as a trustee shall be guilty of usury wherever it takes, receives, reserves or charges a rate of interest greater than that allowed by the state when knowingly done or where it has been agreed upon. Congress has the power to fix the rates of interest which a national bank may take. Schuyler Nat. Bank v. Gadsden, 191 U.S. 451, 24 S.Ct. 129, 48 L. Ed. 258; The Farmers' & Mechanics' Nat'l. Bank, etc., v. Dearing, 91 U.S. 29, 23 L.Ed. 196; Barnet v. Muncie Nat'l. Bank, 98 U.S. 555, 25 L.Ed. 212; Florence, etc., Imp. Co. v. Chase Nat'l. Bank, 106 Ala. 364, 17 So. 720; Lowery v. First Nat. Bank of Oneonta, 239 Ala. 690, 196 So. 891.

■ It follows from the foregoing authorities that a national bank is guilty of usury whether it contracted for a usurious rate or whether without contract it took, received, or reserved such usurious rates. According to the express terms of Section 7225 of the Code, if it be made to appear that usurious interest has been intentionally taken or reserved, the offender must pay full costs.

From a consideration of the whole record, we are of opinion that the Merchants National Bank of Mobile should pay the full costs incurred in this case.

It results that the cause should be and it is reversed for the proper calculations hereinabove set forth and for reservation of credits herein stipulated.

Reversed and remanded with instructions.

GARDNER, C. J., and BROWN and FOSTER, JJ., concur.

KNIGHT, J., not sitting.