FAULKNER, Justice.
William Charles Koster established a trust to provide for the maintenance and support of himself and his wife. After both beneficiaries died, the assets of the trust were to be transferred to the Shriners Hospitals For Crippled Children (Shriners). Koster predeceased his wife, who died on May 26, 1979. On May 1, 1981, Shriners brought this action to compel an accounting and a transfer of the assets and seeking damages for conversion, use and occupation of trust lands, and for delay in turning over the assets of the trust. Named as defendants were the co-trustees of the trust, Gerald Leon Robbins and E.W. McKean, and their attorney, Irving Silver. Shriners also sought a judicial determination as to the propriety of claims for fees made by the defendants against the trust estate. The trial court required the defendants to furnish Shriners with an accounting and to effectuate the transfer of the assets, but ruled in favor of the defendants in all other respects. Shriners appeal *800 ed. We affirm in part, reverse in part, and remand.
Because a major issue in the case concerns the reasonableness of the trustees’ delay in turning over the assets and in furnishing an accounting, it is necessary to examine the communications between the parties and other events relating to administration of the trust between the time Mrs. Koster died and the time suit was filed.
On March 10, 1980, over nine months after Mrs. Koster died, Silver sent a letter on behalf of the trustees advising Shriners of her death. The letter suggested that a “face-to-face” meeting be arranged so the “unfinished business of the estate could be coordinated and the transition effectuated.” The letter also requested that Shri-ners “establish” that it was a tax exempt charitable organization. (The trust instrument provided that if Shriners Hospitals was not “an organization described in Section 170(c) and Section 2055(a) of the Internal Revenue Code” the assets were to be transferred to another charity or other charities.) Shriners replied with a letter requesting a list of the trust’s assets and their values in order to enable it to determine how to proceed.
Silver wrote Shriners again on May 12th. He stated that the estate was “ready to be transferred” and he requested that Shri-ners advise him as to when it would be convenient to meet. In response, Shriners wrote Silver a letter stating:
“Thank you for your letter of May 12, 1980, wherein you referred to establishing a meeting with Shriners Hospitals and the current Trustees in order to effectuate the change of assets.
“As a rule, all transfer[s] of assets are made by the filing of Accountings and Inventories with our office, the approval of those accounts and then the mailing of the assets to our National office here in Tampa. Unless there is an unusual situation which will require our presence, we would like to have the assets forwarded to us here in Tampa.
“I have also written Mr. E.W. McKean, Jr., a copy of that letter is attached, requesting information on the assets, etc. To date, I have not had a response to my letter and I will be writing him another letter again requesting this information.
“We look forward to hearing from you in regard to the closing of this Trust in due course.”
In response Silver sent Shriners a letter stating that the basis for his request of a meeting between the parties was that the estate contained “several parcels of low income rental property” which would require local management. He suggested to Shriners that it contact one Morris Burger, a former Potentate, who could advise it as to the particulars of the situation.
The next communication between the parties was during the following August. At that time Shriners renewed its request for an accounting. Silver replied that the trustees expected to turn over all the assets on December 1, 1980. Prior to that time, he continued, the trustees would forward a “full detailed accounting.”
The trustees did not transfer the assets or furnish an accounting during December as promised. In mid-January, out of a concern for the estate, Shriners retained an attorney in Mobile, where the trustees reside and where the assets were located, in order to investigate the delay. In response to the attorney’s inquiry, Silver sent another letter, indicating that an accounting was “in the works” and that it should be submitted by February 20th. Silver indicated that the delay had been occasioned by “other business and staff problems.”
The accounting was being performed by trustee McKean and his employees. McKe-an is a certified public accountant. During his compilation of the data necessary for completing the accounting, McKean discovered that his co-trustee, Robbins, had drawn eight checks on the trust’s account totaling $16,054.27. The checking account had been set up in such a way that it was not necessary to have both trustees’ signatures in order to write checks. Six checks totaling $4,649.45 were for cattle purchased in Robbins’s name and placed on his land. One check for $1,675.87 was for *801 back taxes on land owned by Robbins. The remaining $9,728.95 was paid to a creditor of the Robbins Fence Company, a company owned by Robbins’s family. McKean notified Silver of the misappropriations. In a letter dated March 26, 1981, Silver notified Robbins that an examination' of the trust records revealed that Robbins had “embarked upon a systematic means of utilizing trust assets for [his] own personal use.” Silver reminded Robbins that Shri-ners owned the assets of the trust “as of the moment of Mrs. Roster’s death” and that the appropriations began over a year after her demise.
On March 28 McKean sent Shriners a partial accounting covering the period ending April 30, 1980. His letter indicated that a “detailed listing of assets and a more current accounting will be mailed to you shortly.” The period covered by the accounting ended before Robbins began the misappropriations. Shortly after the letter was sent, Silver called the attorney for Shriners and requested a meeting, which took place on April 7. At that meeting Silver and McKean advised Shriners of the disbursements, and soon thereafter Shri-ners filed suit.
The suit was filed on May 1, 1981. On the following July 15, Robbins repaid the misappropriated funds with interest. Although the money had been repaid, the parties were unable to settle the case, because they were unable to agree on the payment of fees charged by Silver and McKean. On November 6, Silver and McKean again met with the attorney for Shriners. Silver claimed $3,718.00 for services rendered to the trust. McKean claimed $5,058.77. The attorney for Shri-ners testified at trial that at the meeting Silver and McKean refused to turn over any of the assets of the estate unless Shri-ners agreed to allow them to charge the estate for their services. Silver and McKe-an claimed that Shriners refused to accept the assets until a court had ruled on payment of the fees.
The trial court, sitting without a jury, ruled in favor of the defendants. It allowed McKean to charge the trust $11,-064.58 for services rendered, including remuneration for time spent preparing for the trial and time spent in court and at depositions. The court approved Silver’s bill for $20,951.55. It ordered the trust to pay two-thirds of the bill and it gave Silver a judgment against Robbins for the remaining third. The court also awarded Robbins and McKean a joint trustees’ fee of $1,376.00. It ordered that the half of the fee allowable to Robbins be paid to Silver.
I.
Shriners argues that the trial court erred in refusing to grant it any relief under its counts for conversion, use and occupation of the trust lands, and for delay in turning over the trust assets.
There is no dispute that Shriners was beneficially entitled to the trust property on Mrs. Roster’s death. The trustees were under a duty to wind up the trust after Mrs. Koster died and to transfer the trust assets to the plaintiff. The length of time which the law will allow the trustees to transfer the assets of a trust after it terminates depends on the circumstances, viz., the size and nature of the estate, the type of assets involved, the difficulty encountered in gathering together the assets, the difficulty in determining who to transfer the property to, etc. See the Restatement (Second) of Trusts % 344 (1959). The trustees are also under a duty to furnish the beneficiary complete and accurate information as to the nature and amount of the trust property. Restatement (Second) of Trusts § 173 (1959).
Shriners argues that the period of delay in winding up the trust and in transferring the assets was unreasonable. The trustees did not inform Shriners of Mrs. Roster’s death for over nine months. Despite Shri-ners’ repeated requests for information as to the size of the estate and the nature of the assets, a full accounting was not submitted until September 3, 1982, over three years after Shriners’ right to possession accrued. The trustees did not even submit *802 a partial accounting for a year after it was first requested.
The assets in the estate were valued at about $110,400.00. The trust contained three parcels of real estate, valued at about $28,000.00, and six mortgages being collected by a bank, valued at about $24,-000.00. Shriners argued that nothing was required to transfer the assets except to assign the notes, execute deeds to the real estate, send checks for the amounts on deposit and, send a notice to the Internal Revenue Service that the tax refund should be sent to Shriners. Instead, Shriners says, the defendants procrastinated and Robbins defalcated with part of the funds, thereby creating the need for litigation and causing the parties to incur unnecessary expenses.
In defense of their delay in turning over the trust assets and in failing to provide an accounting, the trustees argue that: (1) They at all times recognized Shriners’ rights to the property; (2) Shriners failed to furnish them with evidence that it was a tax exempt organization; (3) They could not simply mail the documents to Shriners in the way Shriners suggested, because it was necessary for them to “safeguard” and “manage” the assets of the trust; and (4) Shriners failed to present a person to whom they could turn over the assets.
The issue of whether the trustees’ delay in turning over the trust assets amounted to conversion was a disputed question of fact which was resolved by the trial court. Although the time taken by the trustees to wind up the trust appears to us to have been disproportionate to the difficulty of the task, the reasonableness of the trustees’ actions was a disputed issue of fact which was resolved by the trier of fact and, therefore, is governed by the ore tenus rule. Since we do not substitute our opinion as to the reasonableness of the delay for the findings of "the trier of fact, we feel constrained to affirm the judgment as it relates to the conversion counts.
II.
Shriners also questions the award of attorney’s fees, accountant’s fees and trustees’ fees. Shriners disputes both the award and the reasonableness of the amount of the fees.
Upon settlement of a trust estate the court may award fees or other compensation to be paid from the trust assets to trustees and attorneys representing trustees for services rendered to the estate. Section 19-3-6, Code of Alabama. The trust instrument in question also authorized the hiring of attorneys “and other agents” to aid the trustees in administering the trust and to pay the agents for their services from the assets of the estate.
The fee award was, however, clearly erroneous in this case. The bulk of the fees was not “for services rendered to the estate” or for aiding the trustees “in the administration of” the estate. Most of the fees in question constituted litigation expenses, which in this instance were not chargeable against the estate. When litigation expenses are necessary for the proper administration, preservation, and execution of the trust, the attorney’s fees incurred by the trustees are chargeable against the estate. See Annot. 9 A.L.R.2d 1140; 90 C.J.S. Trusts § 284 (1955). Attorney’s fees are not allowable as a charge against the estate, however, where the litigation is caused by the mismanagement or maladministration of the trustees, nor are they chargeable against the estate where the services are rendered for the sole protection of the trustees. Grace v. Solomon, 241 Ala. 452, 455, 3 So.2d 3, 5 (1941). See also Dunbar v. Birmingham Trust National Bank, 286 Ala. 168, 238 So.2d 336 (1970).
The evidence is undisputed that nearly two years elapsed between Mrs. Roster’s death and the filing of the complaint. During that period none of the assets were transferred to the plaintiff. Although the trustees claim that they were ready and willing at all times to transfer the assets to the plaintiff, it is undisputed *803 that at the time the complaint was filed nearly a year had passed since the plaintiff had requested an accounting and that a full accounting was not provided until after suit was filed and the trustees were ordered to furnish plaintiff with a full accounting. When a beneficiary must resort to litigation to compel a trustee to make a final settlement, the beneficiary should not be forced to bear the trustee’s litigation expenses. Murphy v. Merchants National Bank of Mobile, 240 Ala. 688, 702, 200 So. 894, 905 (1941).
It is also undisputed that the plaintiff filed suit immediately upon discovering that Robbins had misappropriated funds from the estate. Although the defendants, in arguments made on appeal, refer to the appropriations as “investments” and “loans” and argue that “there was no evidence of bad faith or neglect by the trustees,” we opine that Attorney Silver’s earlier assessment of the situation comported more closely to the truth of the matter. In a letter to Robbins he stated, “you have embarked upon a systematic means of utilizing trust assets for your own personal use; in violation of [the] law.”
Although Robbins was primarily responsible for causing the litigation, McKean was not entirely free from fault in that regard. In addition to his role in failing to promptly provide the plaintiff with an accounting, his failure to exercise due care in the administration of the estate enabled Robbins to misappropriate the funds. In Caldwell v. Graham, 115 Md. 122, 80 A. 839 (1911), Trustee C agreed with his co-trustee, W, that C was to have sole responsibility for administration of the trust’s real estate and W was to have sole responsibility for administration of the trust’s personalty. W embezzled funds from the trust. In an action against C for negligence in failing to prevent W’s devas-tavit the court ruled that, once having undertaken the duty to act as trustee, C could not limit his obligation or divest himself of his fiduciary duty by assigning part of his fiduciary duty to W. Although as a general rule a trustee is responsible only for his own acts or omissions, he is liable for a breach of trust on the part of a co-trustee which he could have prevented through the exercise of reasonable care.
In response to plaintiff’s argument that McKean was also responsible for the misappropriation, the defendants argued that a trustee is not liable for the actions of his co-trustee unless he knowingly permits or acquiesces in the breach of trust. In support of that position the defendants relied on Hinson v. Williamson, 74 Ala. 180 (1883). Although this Court in Hinson did state the general rule that a trustee is not responsible for the acts of his co-trustee, the Court went on in that same opinion to state that “trustees are liable each for the other, if it is mutually- agreed between them that one shall have the exclusive management of one part of the trust property and a loss results which could have been avoided if both trustees had attended to all the assets.” Hinson at 195.
McKean testified that “it was understood” between himself, Robbins, and Koster that Robbins would be responsible for the checking account and that McKean would be responsible for the accounting. Nothing in the trust instrument itself authorized such an arrangement, however. As Attorney Silver pointed out in a letter to the trustees prior to opening the account, “I think that prudence ... would mandate that a checking account be set up exclusively in the name of the Trust and that dual signatures be required on each check.” We agree. If Silver’s advice had been followed, McKean would have been in a position to prevent the misappropriations.
We are aware that the trust instrument provided that the trustees should not be held liable for .mistakes or errors in judgment. While that provision in the trust instrument might prevent the plaintiff from receiving a judgment against McKean based on Robbins’s misappropriations, it does not prevent McKean from sharing in the responsibility for bringing about the litigation.
We affirm in part, reverse in part, and remand. The trust should not be charged *804 with any of the defendants’ litigation expenses. Only the reasonable and necessary fees incurred in the administration of the estate should have been charged against it.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and ALMON, EMBRY and ADAMS, JJ., concur.