PER CURIAM.
 

 Raymond L. Shaffer appeals from a summary judgment in favor of Regions Financial Corporation (“Regions”). We affirm in part, reverse in part, and remand.
 

 Procedural History
 

 On March 2, 2005, Shaffer sued Regions, alleging breach of contract, fraudulent suppression, and fraudulent misrepresentation
 
 *875
 
 and seeking specific performance of a contract arising out of Shaffer’s employment with Regions. All the claims concerned a change-of-control agreement
 
 [1]
 
 Shaffer alleges he entered into with Regions. On April 7, 2005, Regions answered Shaffer’s complaint. On November 14, 2006, Shaffer moved for a partial summary judgment on his breach-of-contract claim, and on January 8, 2007, Regions moved for a summary judgment on all claims.. On May 4, 2007, the trial court, without stating the specific basis for its holding, entered a summary judgment in favor of Regions on all the claims. Shaffer appealed.
 

 Facts
 

 The evidence, viewed in the light most favorable to Shaffer, the nonmovant,
 
 Wilma Corp. v. Fleming Foods of Alabama, Inc.,
 
 613 So.2d 359 (Ala.1993), suggests the following facts.
 

 John Dick, Regions’ chief information officer and an executive vice president, worked with Shaffer at General Motors Acceptance Corporation (“GMAC”) until August 2001, when Dick left GMAC to work for Regions. In early 2002, after being contacted by Dick, Shaffer applied for a position with Regions. Dick and Shaffer had several discussions about the position at Regions. According to Shaffer, part of those discussions concerned Shaffer’s receiving a change-of-control agreement as part of a job offer from Regions. Regions decided to hire Shaffer and sent him a letter dated March 14, 2002, which set forth the terms of Regions’ job offer to Shaffer. The letter stated, in pertinent part:
 

 “Please allow me to reiterate the elements of our job offer to you. They are as follows:
 

 “Title: Director of Technology Management Senior Vice President
 

 “Reports To: John Dick
 

 Chief Information Officer
 

 Executive Vice President
 

 “Salary: $5,846.16 bi-weekly
 

 ($152,000.00 annually)
 

 “Plus:
 

 Inclusion into the Management Incentive Plan (35% target), and the Long Term Incentive Plan (target of 5,000 options), effective calendar year 2002.
 

 —
 
 Included with the MIP incentive plan throughout employment is Regions’ Change of Control agreement.
 

 “Start Date: April 8, 2002
 

 “Benefits: Regions Financial Corporation employee benefits as outlined in our Benefits Brochure. Plus, in exception to standard Regions Vacation Policy as described in the benefits summary, two (2) additional weeks, for a total of three (3) weeks of paid vacation in 2002. Thereafter, running concurrent with your title, a total of three (3) weeks paid vacation each year.”
 

 (Emphasis added.) Shortly after receiving this letter, Shaffer began working for Regions.
 

 Shaffer testified that he did not rely on the specific terms of the change-of-control agreement when he accepted the job with Regions and that he did not know what the specific terms of the agreement were. Shaffer further testified that he did not discuss the specific terms of the change-of-control agreement with anyone before he started working for Regions. Shaffer stated that he does not know whether he
 
 *876
 
 would have taken the job with Regions if the change-of-control agreement was not part of the job offer. Shaffer testified that Dick used the change-of-control agreement as a selling point whenever they talked about the job, telling him that, “because [Regions] was a regional bank, [a change-of-control agreement] was a good item to have.”
 

 Shaffer testified that “a couple of weeks” after he began working for Regions, he received a change-of-control agreement through the interoffice mail. He testified that he signed the agreement and returned it to Regions’ human-resources department and that he did not keep a copy of the agreement. Regions has been unable to find the agreement Shaffer says he signed and returned. Shaffer never saw a copy of the change-of-control agreement that was signed by a representative of Regions.
 

 Rebecca Crenshaw, Regions’ professional recruiting manager, testified that she had no doubt that Shaffer had a change-of-control agreement with Regions. According to Crenshaw, Shaffer was designated to be in tier three of the management-incentive plan, and a change-of-control agreement was an automatic component of the compensation of any employee who was designated to be in tier three.
 

 A designated representative of Regions testified that Regions used two standard forms of the change-of-control agreement. The two forms were identical, except that one contained a “walk-away” provision that was offered to the very top executives at Regions. The representative testified that Shaffer was not at such a level in Regions’ organizational structure that he would have been offered the change-of-control-agreement form containing the “walkaway” provision.
 

 As evidence of the terms of the change-of-control agreement that Shaffer says he entered into with Regions, Shaffer presented to the trial court a change-of-control agreement signed by Srinivas Sura-paneni, who was part of the technology-management department and who reported directly to Shaffer. Surapaneni’s change-of-control agreement states, in pertinent part:
 

 “3.
 
 Termination of Employment.
 
 If the Employee’s employment with the Company and with its Affiliates shall be terminated within twenty-four (24) months following a Change of Control, the Employee shall be entitled to the following compensation and benefits:
 

 “(a) If the Employee’s employment with the Company and with its Affiliates shall be terminated (i) by the Company for Cause or Disability, (ii) by reason of the Employee’s death, or (iii) by the Employee other than for Good Reason, the Company shall pay to the Employee the Employee’s Accrued Compensation. The Employee’s entitlement to any other compensation or benefits shall be determined in accordance with the Company’s employee benefit plans and other applicable programs and practices then in effect.
 

 “(b) If the Employee’s employment with the Company and with its Affiliates shall be terminated for any reason other than as specified in Section 3(a) above, the Company shall pay to the Employee the aggregate of the Employee’s Accrued Compensation plus an amount equal to two times the sum of the Employee’s Base Amount and Bonus Amount as severance pay and in lieu of any further compensation for periods subsequent to the Termination Date.”
 

 The agreement defines “Good Reason” as follows:
 

 “(I) the occurrence, after a Change of Control of any of the following events or conditions:
 

 
 *877
 
 “(A) a change in the Employee’s status, title, position or responsibilities (including reporting responsibilities) which, in the Employee’s reasonable judgment, represents a materially adverse change from his status, title, position or responsibilities as in effect immediately prior thereto; the assignment to the Employee of any duties or responsibilities which, in the Employee’s reasonable judgment, are materially inconsistent with his status, title, position, responsibilities; or any removal of the Employee from or failure to reappoint or reelect him to any such offices or positions, except in connection with the termination of employment of the Employee for Disability, Cause, as a result of the Employee’s death or by the Employee other than for Good Reason.”
 

 The agreement further states:
 

 “7.
 
 Fees and Expenses.
 
 The Company agrees to pay as incurred, to the full extent permitted by law, all legal fees and expenses which the Employee may reasonably incur as a result of any contest (regardless of the outcome thereof) by the Company, the Employee or others of the validity or enforceability of, or liability under, any provision of this Agreement or any guarantee thereof (including as a result of any contest by the Employee about the amount of any payment pursuant to this Agreement).”
 

 In January 2004, a merger between Regions and Union Planters Bank was announced. The merger was consummated on July 1, 2004.
 

 In late April 2004 or early May 2004, change-of-control agreements were discussed in a staff meeting for some of Regions’ employees. The human-resources department informed everyone at the meeting that the department was willing to provide them with a document summarizing the important aspects of the change-of-control agreement. After the staff meeting, Shaffer obtained a copy of the summary document from Angie Parker, Regions’ group human-resources manager. The summary document stated, among other things, that “[t]he consummation of the pending merger between Regions and Union Planters will constitute a ‘Change of Control’ within the meaning of your Change of Control Agreement with Regions.”
 

 After the merger was announced, Dick formed various committees to analyze how to integrate the Regions and Union Planters technology departments. The committees included people from both Regions and Union Planters, and Shaffer was on two of the committees, one of which was the committee that developed the plan for the new planning and integration department. This committee did not recommend that Shaffer be in charge of the new department. Shaffer agreed with the committee’s recommendations concerning how to structure the new department. Shaffer testified that the committee’s recommendations “made sense for that organization.” Shaffer further testified that as an officer of the company he had a responsibility to build the organization in the best way for Regions and that is what he did.
 

 Regions conducted interviews to decide what positions certain people would be placed in after the merger was completed. Shaffer interviewed with Dave Aldridge, who was the chief technology officer at Union Planters. After this interview process, Shaffer was offered the position of director of IT (information technology) planning and integration. Shaffer’s compensation and benefits remained unchanged, and he remained a senior vice president. Dick testified that the function of Shaffer’s job changed after the merger. According to Dick, Shaffer “assumed a
 
 *878
 

 more
 
 strategic role in the group” and “[f]o-cused on more strategic issues.” Shaffer testified that his job responsibilities changed after the merger. Dick and Parker testified that Shaffer lost some of his “day-to-day operating activities” after the merger, such as “text services.”
 
 [2]
 
 According to Dick, after the merger, a systems-integration function was added to the responsibilities of Shaffer’s group so that Shaffer could focus on IT planning strategy, architecture standards, and systems integration.
 

 In his role as the director of technology management at Regions, Shaffer had about 35 employees under his supervision. Dick testified that after the merger Shaffer had approximately five to nine people under his supervision. According to Dick, this reduction in staff size was directly linked to Shaffer’s change in responsibilities after the merger.
 

 Before the merger, Shaffer reported directly to Dick. After the merger, Dick remained in the position of chief information officer. According to Dick, Regions wanted to retain Aldridge as part of the post-merger technology organization, so it offered him a position immediately under Dick’s and immediately above Shaffer’s within the new organizational hierarchy. In the spring of 2004, Dick informed Shaffer that after the merger he would be reporting to Aldridge. However, Aldridge ultimately decided not to work for Regions. Dick informed Shaffer of Al-dridge’s decision. Shaffer testified that he reported to Aldridge for a short period immediately following the merger until he was “moved back underneath [Dick]” when Aldridge left. According to Parker, Al-dridge’s position was not “internally eliminated” when he left and there was no way for Shaffer to know whether Aldridge’s position would be filled at a later time. Shaffer testified that he had a conversation with Dick concerning Aldridge’s position, and, Shaffer says, Dick indicated that the position would not be eliminated and that he did not know whether it would be filled.
 

 In Shaffer’s view, in his new position as director of IT planning and integration he played “a critical role” for Regions. However, Shaffer testified that for him this position was only an “all right” opportunity.
 

 After the merger was announced but before it was completed, Shaffer was informed by one of his vendors that the position of director of information technology was open at Compass Bank (“Compass”). Based on this information, Shaffer contacted Charles Reid, the incumbent in that position. Compass interviewed Shaffer on July 28, 2004, and, in a letter dated September 3, 2004, offered Shaffer the position. The offer stated, among other things, that Shaffer would be an executive vice president, that he would receive an annual salary of $190,000, that he could participate in an incentive plan that would allow him to earn an annual bonus of up to 50 percent of his annual salary, and that he would be guaranteed a minimum bonus of $95,000 for 2004. Shaffer testified that the job with Compass was better than his job with Regions.
 

 On September 10, 2004, Shaffer sent a letter announcing that he would resign from Regions on September 25, 2004. On September 13-14, 2004, Shaffer and Parker exchanged e-mail messages about the change-of-control agreement Shaffer alleged he had executed. Parker assumed that Shaffer, because of his management position, had a change-of-control agreement, and Parker’s understanding was
 
 *879
 
 that all employees at the level of management in the company at which Shaffer was had the same change-of-control agreement. During the course of the e-mail exchange, Parker reviewed a change-of-control agreement of another employee who was at the same management level as Shaffer to determine whether she thought Shaffer was entitled to compensation under a change-of-control agreement he might have executed. Parker concluded that Shaffer was not entitled to any payment under the terms of the change-of-control agreement because, she thought, he had not been adversely impacted by the merger. Parker informed Shaffer of her conclusion, but she advised him to refer to his own agreement. Shaffer responded that he “had all of the following, a change in title, change in reporting relationship, not just once but twice, and a large reduction in responsibilities with removal of all distributed computing responsibilities, reduction in staff from 35 + to 5,” and that these changes “reduced [his] standing within the Technology group, effectively moving [him] lower into the overall standings of more important areas, which will impact [his] future earning through lower bonus compensation.”
 

 Regions denied Shaffer’s request for compensation under the change-of-control agreement apparently based primarily on Regions’ belief that the merger did not result in a materially adverse change in Shaffer’s employment. In a letter to Regions’ human-resources director dated October 30, 2004, Shaffer appealed Regions’ decision to deny him compensation under the change-of-control agreement. The letter stated that Shaffer believed that his title had been “reduced,” that he had “dropped one rung” in Regions’ organizational hierarchy, that “there was an adverse change in [his] actual job responsibilities,” that there was a “dramatic reduction of [his] staff,” that he was “stripped of substantive job responsibilities,” that the operational and project responsibilities he enjoyed had been taken away, and that his “job responsibilities were carved off and [his] group was outside of the decision-making loop.” Regions denied Shaffer’s appeal, and he sued Regions.
 

 Standard of Review
 

 In
 
 Pittman v. United Toll Systems, LLC,
 
 882 So.2d 842 (Ala.2003), this Court set forth the standard of review applicable to a summai’y judgment:
 

 “This Court’s review of a summary judgment is de novo.
 

 “ ‘In reviewing the disposition of a motion for summary judgment, “we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,”
 
 Bussey v. John Deere Co.,
 
 531 So.2d 860, 862 (Ala.1988), and whether the movant was “entitled to a judgment as a matter of law.”
 
 Wright v. Wright,
 
 654 So.2d 542 (Ala.1995); Rule 56(c), Ala. R. Civ. P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue.
 
 Bass v. SouthTrust Bank of Baldwin County,
 
 538 So.2d 794, 797-98 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.”
 
 Wright,
 
 654 So.2d at 543 (quoting
 
 West v. Founders Life Assurance Co. of Florida,
 
 547 So.2d 870, 871 (Ala.1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all rea
 
 *880
 
 sonable doubts against the movant.
 
 Wilma Corp. v. Fleming Foods of Alabama, Inc.,
 
 613 So.2d 359 (Ala.1993) [overruled on other grounds,
 
 Bruce v. Cole,
 
 854 So.2d 47 (Ala.2003)];
 
 Hanners v. Balfour Guthrie, Inc.,
 
 564 So.2d 412, 413 (Ala.1990).’ ”
 

 882 So.2d at 844 (quoting
 
 Hobson v. American Cast Iron Pipe Co.,
 
 690 So.2d 341, 344 (Ala.1997)).
 

 Discussion
 

 On appeal, Shaffer’s only contention is that the trial court erred in entering a summary judgment in favor of Regions on his breach-of-contract claim. Shaffer explicitly “[does] not raise the propriety of the entry of [a] summary judgment on the fraud and suppression claim[s].” Shaffer’s reply brief, at 29 n. 8. Therefore, the summary judgment on those claims is affirmed.
 

 In its summary-judgment motion, Regions argued that it did not owe Shaffer any compensation under a change-of-control agreement because, it says, there was no valid change-of-control agreement between Regions and Shaffer or, if there was, Regions did not breach the agreement. Specifically, Regions alleged (1) that Shaffer had failed to present substantial evidence of mutual assent to the essential terms of the change-of-control agreement he says he signed; (2) that the change-of-control agreement was not supported by consideration; (3) that, if the agreement existed, the evidence demonstrated that Regions had not breached the agreement because, Regions argues, Shaffer did not suffer a materially adverse change in his employment; and (4) that Shaffer breached his fiduciary duty to Regions and this breach precluded him from recovery under the agreement.
 

 First, Shaffer contends that he presented substantial evidence that a valid change-of-control agreement existed between him and Regions and substantial evidence of the essential terms of the agreement. Regions argues that Shaffer did not present substantial evidence of the existence of the agreement or its terms because Shaffer has not produced a copy of a change-of-control agreement signed by him and Regions has no record that he signed a change-of-control agreement.
 

 “The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs’ performance under the contract; (3) the defendant’s nonperformance; and (4) resulting damages.”
 
 Reynolds Metals Co. v. Hill,
 
 825 So.2d 100, 105 (Ala.2002). The elements of a valid contract include: “ ‘an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract.’ ”
 
 Ex parte Grant,
 
 711 So.2d 464, 465 (Ala.1997) (quoting
 
 Strength v. Alabama Dep’t of Fin., Div. of Risk Mgmt.,
 
 622 So.2d 1283, 1289 (Ala.1993)). Under the Alabama Rules of Evidence, “when an issue is raised (a) whether the asserted writing ever existed, or ... (c) whether other evidence of contents correctly reflects the contents, the issue is for the trier of fact to determine as in the case of other issues of fact.” Rule 1008, Ala. R. Evid.
 

 In the present case, when the evidence is reviewed, as it must be, in a light most favorable to Shaffer, as the nonmov-ant, there is a genuine issue of material fact as to whether a change-of-control agreement between Shaffer and Regions existed. It is undisputed that an element of Regions’ written job offer to Shaffer included “Regions’ Change of Control agreement.” Shaffer testified that he received the change-of-control agreement from Regions soon after he began working for Regions, that he signed it, and that he returned it to Regions’ human-resources
 
 *881
 
 department. Regions’ professional recruiting manager testified that Shaffer would definitely have had a change-of-control agreement because, she said, the agreement was an automatic component of the compensation of any employee in tier three of the management-incentive plan. Because this evidence creates a genuine issue of material fact as to whether a change-of-control agreement existed, a summary judgment in favor of Regions on the basis that such an agreement did not exist is not proper.
 

 Also, if a change-of-control agreement existed, a genuine issue of material fact exists as to its terms. Regions’ designated representative testified that Regions used two standard forms of change-of-control agreement that were almost identical. The only difference was that one form contained a provision offered only to executives above Shaffer’s management level. Shaffer presented to the trial court a complete change-of-control agreement signed by Surapaneni, who was directly below Shaffer’s management level. The trier of fact could decide that, if a change-of-control agreement existed between Shaffer and Regions, Surapaneni’s change-of-control agreement correctly reflects the contents of Shaffer’s agreement. Therefore, a summary judgment in favor of Regions based on a failure to present substantial evidence of the essential terms of the change-of-control agreement was not proper.
 

 Next, Shaffer alleges that his change-of-control agreement was supported by consideration. “[I]n order to constitute consideration for a promise, there must have been an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise, bargained for and given in exchange for the promise.”
 
 Kelsoe v. International Wood Prods., Inc.,
 
 588 So.2d 877, 878 (Ala.1991). In the context of an employment agreement, what constitutes consideration has been accurately explained by the United States District Court for the District of South Carolina, as follows:
 

 “In a unilateral employment agreement, the employer makes an offer or promise to hire in return for specified benefits and wages and the employee accepts the offer by performing the act on which the promise is impliedly or expressly based; the employee’s act or forbearance in reliance on the employer’s promise furnishes consideration to the employer, while the benefits conferred under the terms of the promise constitute consideration for the employee.”
 

 Toth v. Square D Co.,
 
 712 F.Supp. 1231, 1235 (D.S.C.1989) (citing
 
 Small v. Springs Indus., Inc.,
 
 292 S.C. 481, 484, 357 S.E.2d 452, 454 (1987)).
 

 In the present case, Shaffer presented substantial evidence indicating that “Regions’ Change of Control agreement” was part of the written job offer he was presented with and accepted when he began working for Regions. Shaffer presented substantial evidence indicating that he had acted in reliance on the promises set forth in that written job offer when he left his job at GMAC to work for Regions. The trier of fact could decide that these actions by Shaffer furnished the consideration to Regions for the entire employment agreement, including the change-of-control agreement. Therefore, a summary judgment in favor of Regions based on a failure to present substantial evidence of consideration for the change-of-control agreement is not proper.
 

 Next, if a valid change-of-control agreement existed, Shaffer alleges that he presented substantial evidence indicating that Regions breached the agreement when it refused to pay severance compen
 
 *882
 
 sation and legal expenses as set forth in the agreement. It is undisputed that Regions’ merger with Union Planters constituted a “change of control” under the agreement and that Shaffer terminated his employment within 24 months following the change of control. Accepting that the trier of fact can decide that a valid change-of-control agreement existed between Regions and Shaffer, the issue presented for our review is whether Shaffer presented substantial evidence creating a genuine issue of material fact as to whether he terminated his employment with Regions for “good reason.” Under the agreement, if he terminated his employment for good I’eason, Regions would be obligated to pay Shaffer the aggregate of his accrued compensation plus severance pay and legal expenses. Specifically, Shaffer alleges that, in accordance with the terms of the change-of-control agreement, he presented substantial evidence indicating that he terminated his employment for “good reason” because, he says, he presented substantial evidence indicating that, in his “reasonable judgment,” he suffered a “materially adverse” change to his status, title, position, or responsibilities after the change of control.
 

 Ordinarily, “[t]he question of reasonableness is one of fact to be resolved by the trier of fact.”
 
 Gunter v. Beasley,
 
 414 So.2d 41, 44 (Ala.1982) (holding that the reasonableness of the amount of an expense allowance granted to a former lieutenant governor was a question for the trier of fact). See
 
 Mutual Assurance, Inc. v. Schulte,
 
 970 So.2d 292, 296 (Ala.2007) (holding that the reasonableness of a liability insurer’s reliance on a validly enacted statute that capped damages for medical malpractice but that was later ruled unconstitutional was “a question that is better left to the trier of fact” in the insureds’ action alleging negligent failure to settle);
 
 United States Fidelity & Guar. Co. v. Baldwin County Home Builders Ass’n,
 
 770 So.2d 72, 75 (Ala.2000) (holding that if conflicting inferences can be drawn from the evidence, the question of the reasonableness of an insured’s delay in giving notice to the insurer of a claim is to be submitted to the trier of fact);
 
 Shriners Hosps. for Crippled Children v. Robbins,
 
 450 So.2d 798, 802 (Ala.1984) (holding that the reasonableness of the trustees’ delay in turning over trust assets to the trust beneficiary was a question of fact to be resolved by the trier of fact);
 
 Parker v. King,
 
 402 So.2d 877, 879 (Ala.1981) (citing approvingly the general rule followed by the federal courts that disapproves of summary judgments in negligence cases because of the necessity that the trier of fact pass upon the reasonableness of the conduct at issue);
 
 White v. Drivas,
 
 954 So.2d 1119, 1124 (Ala.Civ.App.2006) (holding that the reasonableness of a mobile-home owner’s refusal to return personal property unless the owner of the personal property paid for expenses incurred is a question for the trier of the fact); and
 
 Jimoco, Inc. v. Smith, 111
 
 So.2d 716, 718 (Ala.Civ.App.2000) (holding that, under the workers’ compensation act, the determination of the reasonableness of an employer’s request for an examination by the employer’s physician, and thus of the reasonableness of any refusal of the employee to submit to an examination, is a question for the trier of fact).
 

 When the evidence is viewed, as it must be, in a light most favorable to Shaffer, he presented substantial evidence creating a genuine issue of material fact as to whether his responsibilities changed after the mex-ger. Dick testified that the function of Shaffer’s position changed after the merger. Shaffer testified that his job responsibilities changed after the merger. Dick and Parker testified that Shaffer lost some of his “day-to-day operating activities” af
 
 *883
 
 ter the merger. According to Dick, certain functions were added to the responsibilities of Shaffer’s group after the merger. Dick testified that the size of Shaffer’s staff was reduced after the merger and that this reduction was directly linked to Shaffer’s change in responsibilities. Before the merger, Shaffer reported directly to Dick, but for a period after the merger, Shaffer reported to Aldridge, who in turn reported to Dick. According to Parker, Aldridge’s position was not “internally eliminated” when he left and there was no way for Shaffer to know whether Al-dridge’s position would be filled at a later time. Shaffer testified that Dick indicated that the position would not be eliminated and that he did not know whether it would be filled. Therefore, a summary judgment in favor of Regions based on its allegation that Shaffer failed to present substantial evidence indicating that his “status, title, position, or responsibilities” changed after the merger is not proper.
 

 Shaffer also presented substantial evidence indicating that a genuine issue of material fact exists as to whether, in Shaffer’s “reasonable judgment,” the changes were materially adverse. Shaffer submitted substantial evidence indicating that the following changes, in his judgment, were materially adverse: His job title was less prestigious, he occupied a lower position in Regions’ organizational hierarchy, his staff was reduced in size, he was stripped of substantive job responsibilities, certain responsibilities that he enjoyed were taken away, his job responsibilities were lessened, and his group was placed outside the decision-making loop. If the trier of fact concludes that these changes did in fact occur, then it could find that an ordinary employee in Shaffer’s position would judge these changes to be “materially adverse.” We conclude that the reasonableness of Shaffer’s judgment is a question of fact for the trier of fact to decide. Therefore, a summary judgment in favor of Regions is not proper based on its allegation that it did not breach the change-of-control agreement.
 

 Finally, Shaffer alleges that a summary judgment in favor of Regions is not proper based on its allegation that he breached his fiduciary duty to Regions. Regions argues that the summary judgment was proper because “[p]ursuant to the ‘faithless servant’ doctrine, breach of fiduciary duty is an affirmative defense to a claim by a corporate officer of breach of contract.” Regions’ brief, at 53. Specifically, Regions alleges that Shaffer breached his duty to Regions by serving on a committee that recommended some of the changes he now argues were materially adverse to his employment and by not informing Dick that he thought the recommended changes were materially adverse to his employment when the committee recommended them.
 

 “The proponent of an affirmative defense ‘bears the burden of proving the essential elements of his affirmative defenses.’ ”
 
 Ex parte Ramsay,
 
 829 So.2d 146, 152 (Ala.2002) (quoting
 
 Ex parte Blue Cross & Blue Shield of Alabama,
 
 773 So.2d 475, 478 (Ala.2000)).
 

 In
 
 Edwards v. Allied Home Mortgage Capital Corp.,
 
 962 So.2d 194 (Ala.2007), this Court explained the faithless-servant doctrine:
 

 “The faithless-servant doctrine precludes an employee from receiving compensation for conduct that is disloyal to the employer or in violation of the employee’s employment contract. The
 
 Restatement (Second) of the Law of Agency
 
 § 469 (1958) describes the doctrine:
 

 “ ‘An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty;
 
 if such conduct constitutes a
 
 
 *884
 

 ivilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.’
 

 “(Emphasis supplied.)
 

 “This longstanding doctrine remains effective today. It was first recognized in
 
 McGar v. Adams,
 
 65 Ala. 106 (1880). In that case, an agent had been employed to find a purchaser for property belonging to his principal. The agent, who was to receive a commission upon the sale of that property, located a purchaser to whom the principal transferred the property. Before that transaction closed and unbeknownst to the principal, however, the purchaser asked the agent — a banker — for a loan to fund the purchase. In lieu of making that loan, the agent and purchaser entered into an agreement pursuant to which the agent could buy a one-half interest in the property. The purchaser conveyed that one-half interest to the agent and split the sales commission the principal had paid the agent. After learning of the agent’s actions, the principal sued the agent to recover the commission. Considering these facts, the
 
 McGar
 
 Court stated:
 

 “ ‘An agent who, for a reward, is employed in the transaction of business, will justly forfeit all right to compensation if he is guilty of bad faith to the principal....’
 

 “65 Ala. at 109.
 

 “The ‘bad faith’ principle in
 
 McGar
 
 was reaffirmed in
 
 Dudley v. Colonial Lumber Co.,
 
 223 Ala. 533, 137 So. 429 (1931):
 

 “ ‘It is unquestionably the law that it is the duty of an agent to act in matters touching the agency, with due regard to the interest of the principal. In accepting the agency he impliedly undertakes to give his principal his best care and judgment, and to use the powers conferred upon him for the sole benefit of his principal consistent with the purposes of the agency....
 

 “ ‘And “an agent who, for a reward, is employed in the transaction of business, will justly forfeit all right to compensation, if he is guilty of bad faith to the principal.” ... ’
 

 “223 Ala. at 536,137 So. at 431.”
 

 962 So.2d at 209-10.
 

 In the present case, there remain genuine issues of material fact regarding whether Shaffer was disloyal to Regions. Regions did not present any evidence indicating that Shaffer’s actions while serving on the committee were unknown to Regions or that Shaffer attempted to mislead Regions with any of his actions. Apparently based on Shaffer’s approval of the recommendations made by the committees he served on, Regions makes a bare allegation that Shaffer “used his position in Regions to engineer a situation that he now claims entitles him to a payment from Regions of nearly half a million dollars.” Regions’ brief, at 56-57. However, Shaffer testified that the committee’s recommendations “made sense for that organization” and that his approval of the recommendations was a fulfillment of his responsibility to build the organization in the best way for Regions. Regions did not present any evidence indicating how Shaffer allegedly manipulated the committee to make recommendations that allegedly benefited him and were unfaithful to Regions. Furthermore, Regions failed to present evidence indicating that Shaffer was dishonest in any of his dealings with Regions concerning the committee recommendations or that the committee recommendations he approved were not in the best interests of Regions. Therefore, a summary judgment in favor of Regions is
 
 *885
 
 not proper based on its allegation that Shaffer breached his fiduciary duty to Regions.
 

 Conclusion
 

 Based on the foregoing, we reverse the summary judgment in favor of Regions as to Shaffer’s breach-of-contract claim, and we affirm the summary judgment in favor of Regions as to all other claims. We remand this case for proceedings consistent with this opinion.
 

 AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
 

 COBB, C.J., and WOODALL, BOLIN, PARKER, and SHAW, JJ, concur.
 

 [1]
 

 . Generally, a change-of-control agreement allows an employee of a company to receive certain compensation if a change in the control of the company causes the employee's employment to be terminated and certain conditions are satisfied.
 

 [2]
 

 . "Text services” include the day-to-day maintenance of the operating system, capacity planning, and troubleshooting around the infrastructure.